J-A15029-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| REBECCA L. JOHNSON | |
| Appellant | No. 1712 EDA 2020 |

Appeal from the PCRA Order Entered September 1, 2020
In the Court of Common Pleas of Northampton County
Criminal Division at No: CP-48-CR-0002774-2012

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| REBECCA L. JOHNSON | |
| Appellant | No. 1713 EDA 2020 |

Appeal from the PCRA Order Entered September 1, 2020
In the Court of Common Pleas of Northampton County
Criminal Division at No: CP-48-CR-0002629-2012

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| REBECCA L. JOHNSON | |
| Appellant | No. 1762 EDA 2020 |

Appeal from the PCRA Order Entered September 1, 2020

In the Court of Common Pleas of Northampton County
Criminal Division at No: CP-48-CR-0000559-2013

BEFORE:  BOWES, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY STABILE, J.:                    **FILED JANUARY 25, 2022**

Appellant, Rebecca L. Johnson, appeals from the September 1, 2020 order dismissing her petitions pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. § 9541-46.  We affirm.

An *en banc* panel of this Court recited the pertinent facts:

> In January of 2012, [Appellant], Roger Suero, David Bechtold, and Quadir Taylor, collaborated to rob [Appellant's] grandmother, Carrie Smith.  Two of the conspirators broke into Ms. Smith's residence in the middle of the night, placed a pillow over her face, stole about $35,000 from a safe, and fled.  Ms. Smith, who suffered from coronary artery disease, atrial fibrillation, and interstitial lung disease, had a minor heart attack during or shortly after the robbery.  Approximately two months later, she died.
>
> Based upon the autopsy results, the Commonwealth claimed Ms. Smith died from the robbery-induced heart attack.  As such, it charged [Appellant] and her co-conspirators with murder of the second degree.  A jury convicted [Appellant] and Suero of the felony murder and related charges, and the trial court sentenced [Appellant] to life in prison without parole.

*Commonwealth v. Johnson*, 236 A.3d 63, 66 (Pa. Super. 2020) (*en banc*).

At trial, the Commonwealth presented expert opinion testimony to establish that the victim's death resulted from the heart attack she suffered shortly after the robbery and not from the underlying health conditions that preceded the robbery.  Appellant's counsel did not counter the Commonwealth's evidence on the cause of the victim's death.  Instead,

counsel sought to establish that Appellant was factually innocent of the robbery.

This Court affirmed the judgment of sentence on March 9, 2015. Our Supreme Court denied allowance of appeal on September 29, 2015. Appellant filed this timely first PCRA petition on June 6, 2016. Appointed counsel filed an amended petition on September 2, 2016, and the PCRA court conducted several hearings. Appellant alleged counsel was ineffective for failing to procure expert opinion testimony to challenge the Commonwealth's causation evidence. The PCRA court issued an opinion, dated September 13, 2017, concluding that the issue was of arguable merit, and that counsel had no reasonable strategic basis for failing to investigate a causation defense.[1] The PCRA court authorized funds for an expert witness.

At a May 11, 2018, hearing Appellant produced the testimony of Dr. Wissam Abouzgheib. Dr. Abouzgheib testified that that the minor heart attack the victim suffered shortly after the robbery did not contribute to her death. Rather, the timing of the robbery and the victim's death were coincidental.

_____

[1] To succeed on a claim of ineffective assistance of counsel, a PCRA petitioner must plead and prove by a preponderance of the evidence that (1) the underlying issue is of arguable merit; (2) counsel had no reasonable strategic basis for the disputed action or inaction; and (3) that but for counsel's error there is a reasonable probability that the outcome of the underlying proceeding would have been different. **Commonwealth v. Solano**, 129 A.3d 1156, 1162 (Pa. 2015). This is commonly known as the **Strickland/Pierce** test. **Strickland v. Washington**, 466 U.S. 668 (1984); **Commonwealth v. Pierce**, 527 A.2d 973 (Pa. 1987).

The PCRA court also took judicial notice of the transcripts of testimony of two defense experts—Drs. Edward Viner and Arnold Meshkov—who testified in other proceedings on behalf of Appellant's accomplices. On June 8, 2018, the PCRA court entered an order dismissing Appellant's petition, finding that Appellant failed to prove that the absence of a causation defense was prejudicial. On July 23, 2020, the *en banc* panel of this Court reversed the PCRA court's order and remanded for reconsideration, concluding the PCRA court misapplied the prejudice prong of **Strickland**/**Pierce** because, among other things, it relied on the jury's rejection of defense expert testimony in the trial of accomplice Quadir Taylor. **Johnson**, 236 A.3d at 69-70.

On remand, the PCRA court once again concluded that Appellant failed to establish prejudice and dismissed Appellant's petition. This timely appeal followed. Appellant argues that counsel's deficiencies resulted in a constructive denial of counsel. She also argues that the PCRA court made erroneous findings of fact; erred in finding her experts not credible; and erred in finding no reasonable probability that the outcome of her trial would have been different but for her counsel's ineffectiveness. Appellant's Brief at 4-5.

On review, we must determine whether the record supports the PCRA court's findings of fact, and whether its legal conclusions are free of error. **Commonwealth v. Mason**, 130 A.3d 601, 617 (Pa. 2015). "We view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party." **Id.** We noted above the three elements a petitioner

must plead and prove to prevail on a claim of ineffective assistance of counsel. Counsel is presumed to be effective, and the petitioner bears the burden of proving otherwise by a preponderance of the evidence. ***Commonwealth v. Fulton***, 830 A.2d 567, 572 (Pa. 2003). To establish that counsel was ineffective for failing to call a witness, the petitioner must establish that (1) the witness existed; (2) the witness was available to testify; (3) counsel knew or should have known about the witness; (4) the witness was willing to testify; and (5) the absence of the witness denied Appellant a fair trial. ***Solano***, 129 A.3d at 1166. Of these elements, only the fifth is presently at issue.

First, we consider Appellant's argument that counsel's error resulted in a constructive denial of her right to counsel. Appellant relies on ***Groseclose v. Bell***, 130 F.3d 1161 (6th Cr. 1997), ***cert. denied***, 523 U.S. 1132 (1998), a federal *habeas corpus* case. In that case, the defendant was accused of hiring other men to rape and murder his wife. Counsel presented no witnesses, cross-examined fewer than half of the prosecution's 39 witnesses, and never investigated the defendant's claim that he had no knowledge of the conspiracy to murder his wife, and that the others acted without his knowledge. ***Id.*** at 1166. Counsel had no discernible theory of defense and failed to seek severance of his trial from a codefendant who had confessed and implicated him. ***Id.*** at 1169-70. The Sixth Circuit held that counsel was constitutionally deficient, but ultimately did not decide whether it was a case of presumed prejudice:

The question then becomes whether it is necessary for Groseclose to demonstrate prejudice, under Strickland's second prong, or whether, as the district court believed, [counsel's] performance was so inept as to amount to a constructive denial of counsel, relieving Groseclose of the need to show prejudice. This is not a dispute we need decide, because the prejudice resulting from [counsel's] lawyering is so patent. We find it quite clear that there were defense tactics available to a reasonably competent attorney that create a reasonable probability that, in the absence of [counsel's] incompetence, the jury would have had a reasonable doubt respecting Groseclose's guilt.

*Id.* at 1170 (emphasis added). Thus, ***Groseclose*** is factually inapposite, in that defense counsel mounted no defense at all. Counsel also failed to seek severance from the trial of a codefendant whose defense was adverse to his client. ***Groseclose*** did not involve a causation issue that required expert testimony. Instantly, counsel's handling of Appellant's causation defense is the only issue before us. An opinion of the Sixth Circuit is not binding on this Court and, given the distinctions between that case and the one before us, we find it of little persuasive value. Appellant offers no other legal support for her constructive denial of counsel argument.

Next, we consider Appellant's challenges to the PCRA court's findings of fact and legal conclusions. Per the remand instructions of this Court's *en banc* panel, the PCRA court considered the Commonwealth's experts who testified at Appellant's trial and the expert testimony that Appellant wishes to present on retrial. The court made credibility findings regarding Appellant's experts and weighed the proposed new testimony against the testimony the Commonwealth produced at the first trial.

The first forensic pathologist to testify with respect to the cause of Ms. Smith's death was Dr. Edward Chmara, who was board certified in anatomical, clinical, and forensic pathology and had numerous years of experience in forensic pathology. In this role, Dr. Chmara performed an autopsy of Ms. Smith and was tasked with determining the cause and manner of her death. In preparing to render his opinions, Dr. Chmara reviewed Ms. Smith's medical history, her recent hospital records, her lab studies and discharge summaries, and information regarding both the January 15, 2012 robbery and her lifestyle prior to that event. He noted that, prior to the robbery, Ms. Smith lived alone, was independent in activities of daily living, and regularly cared for others in her community doing tasks such as running errands. On the night of the robbery, Ms. Smith was awoken just after midnight by robbers who held a gun to her head and put a pillow over her head. Later that night, Ms. Smith presented at Easton Hospital with severe shortness of breath, lightheadedness, and chest pain. Doctors at the hospital concluded after testing that Ms. Smith had had a heart attack. These tests measured certain enzymes in the blood that are released when heart cells die during a heart attack. Ms. Smith was discharged from the hospital several days later, only to be readmitted to the hospital on two later occasions for complaints of worsening shortness of breath. Following the first of these later two admissions, Ms. Smith was discharged on supplemental oxygen, which she never required before.

Dr. Chmara related Ms. Smith's medical history, which included high blood pressure, coronary artery disease, atrial fibrillation, interstitial lung disease – also known as pulmonary fibrosis, hypothyroidism, anemia, diabetes, depression, and anxiety. She had a pacemaker placed in August 2011. Dr. Chmara testified that Ms. Smith's lung disease, in which her lungs became fibrotic, would have developed over a long period of time and that people often live with such disease for years. He did note that she had some shortness of breath prior to the robbery, but that, prior to the robbery, this shortness of breath did not appear without exertion. While Dr. Chmara noted that Ms. Smith died *with* pulmonary fibrosis and a host of other conditions, he stated that this did not mean that she died *of* those conditions. Rather, she had been living with them for some time and then rapidly deteriorated after the night of the robbery.

During the autopsy of Ms. Smith, Dr. Chmara weighed each of her organs. He noted that her lungs were very firm, unlike

healthy lungs that have a spongy texture. Her lungs were twice as heavy as they should have been. Dr. Chmara testified that this excess weight was likely due to a combination of pulmonary fibrosis and congestive heart failure, the latter of which results in fluid in the lungs. The presence of excess fluid in the lungs, evidence of congestive heart failure, was observed during autopsy. Dr. Chmara testified that congestive heart failure is the result of decreased heart function, resulting in inefficient pumping of blood by the heart and resultant collection of blood in the lungs. This condition, he testified, can develop acutely after a heart attack because heart cells die during the heart attack, causing the heart to function less effectively. Ultimately, Dr. Chmara opined to a reasonable degree of medical certainty that Ms. Smith died of complications of her January 15, 2012 heart attack, which event caused a chain reaction that exacerbated the conditions she had already been living with for some time.

In addition to Dr. Chmara, the Commonwealth presented the testimony of board-certified forensic pathologist Dr. Isidore Mihalikis. As a forensic pathologist with decades of experience, Dr. Mihalikis opines on the cause and manner of an individual's 'death. After reviewing the autopsy report authored by Dr. Chmara and the medical records of Ms. Smith – including records of her several preexisting conditions – as well accounts [sic] of what took place on January 15, 2012, Dr. Mihalikis opined, to a reasonable degree of medical certainty, that Ms. Smith's death was the result of congestive heart failure and worsening pulmonary fibrosis, resulting in poor oxygen exchange. Critically, Dr. Mihalikis concluded that Ms. Smith's congestive heart failure was itself the result of her heart attack at the time of the robbery. He explained the mechanism of this by stating that muscle fibers die in a heart attack, which causes the heart to be unable to expel blood as efficiently as before, which results in the lungs filling with blood, resulting in a decline of oxygen exchange between the heart and lungs. This, in turn, causes oxygen levels to go down, resulting in further heart damage, resulting in a circle of heart and lung failure, and ultimately death. On top of these issues, Dr. Mihalikis noted that Ms. Smith's pulmonary fibrosis would have caused her lungs themselves to be obstructed, thereby causing her weakened heart to move blood to the lungs even less efficiently.

Dr. Michael Nekoranik is a board-certified critical care specialist in the field of pulmonary medicine. He attended to Ms.

- 8 -

Smith in the hospital in February and March 2012, during her second and third hospital admissions following the robbery. Dr. Nekoranik began his testimony with a review of Ms. Smith's medical history. He noted that, prior to the robbery, Ms. Smith had a preexisting diagnosis of pulmonary fibrosis. This diagnosis had been made within the year prior to the robbery, following at CAT [sic] scan in May 2011. Dr. Nekoranik testified that idiopathic pulmonary fibrosis is a progressive disease of the lungs, with no known cause, that results in scarring of the connective lung tissue. There is no known treatment for this disease, which becomes progressively worse as time passes. While Dr. Nekoranik was not aware of the level of function of Ms. Smith's lungs just prior to the robbery, he notes that individuals with this diagnosis typically have a 5-10 year life expectancy following their diagnosis. Dr. Nekoranik described idiopathic pulmonary fibrosis as resulting in poor function of the alveoli, which are air sacs in the lungs, leading to shortness of breath and poor oxygenation of the blood. Dr. Nekoranik also noted in his testimony that Ms. Smith had preexisting atrial arrhythmia, high blood pressure, high cholesterol, and coronary artery disease. While Dr. Nekoranik did not treat Ms. Smith on the night she first presented at the hospital immediately after the robbery, he did review her hospital records from that date.

In his testimony, Dr. Nekoranik confirmed that on the night of the robbery, Ms. Smith presented at the hospital with shortness of breath and chest pain. Testing revealed elevated cardiac enzymes, indicative of a heart attack, and she received medication to address the heart attack. Ms. Smith was admitted on two other occasions within a few weeks of one another following her first admission, for shortness of breath. On each of these later occasions, her shortness of breath was progressively worse. During her hospital stays, Ms. Smith received chest x-rays, which showed the effects of her idiopathic pulmonary fibrosis and also showed that Ms. Smith had fluid in her lungs, which is indicative of congestive heart failure. As did Dr. Mihalikis, Dr. Nekoranik testified that this fluid in Ms. Smith's lungs would have exacerbated the effects of her idiopathic pulmonary fibrosis. There was no indication in Ms. Smith's medical records of congestive heart failure prior to January 2012. Following her second hospital stay, Ms. Smith was discharged on supplemental oxygen. This was the first time she had required supplemental oxygen. Dr. Nekoranik testified that Ms. Smith's heart attack could have affected her lungs insofar as a heart attack damages

heart muscle, causing it to pump less effectively, which would in turn cause fluid congestion, e.g., blood leaking back into the lungs. While Dr. Nekoranik –a pulmonary critical care specialist – did observe that Ms. Smith had idiopathic pulmonary fibrosis contributing to her shortness of breath and lack of oxygenation, he believed that her congestive heart failure also played a role in her death. He further testified that this belief was supported by the fact that, on autopsy, Ms. Smith's lungs were noted to be quite heavy and filled with fluid.

Dr. Nekoranik's testimony with respect to Ms. Smith's diagnosis was supported by the testimony of Dr. Rajeev Rohatgi, Ms. Smith's treating cardiologist. Ms. Smith had been Dr. Rohatgi's patient since 2006, which he first encountered her for a complaint of atrial fibrillation, which is an irregular heartbeat. Dr. Rohatgi is a board-certified cardiologist practicing since 1982. Dr. Rohatgi confirmed Dr. Nekoranik's testimony that Ms. Smith had preexisting coronary artery disease. He also noted that in 2011 she had a pacemaker placed in order to correct her atrial fibrillation. With respect to the events on January 15, 2012, Dr. Rohatgi confirmed that Ms. Smith presented at the hospital with complaints of shortness of breath and chest pain, that she was given an echocardiogram and an EKG, and that enzyme tests revealed that she had had a heart attack. Concerning Ms. Smith's heart attack, Dr. Rohatgi testified that fear can cause a heart attack, and that following a heart attack an individual can continue to suffer ill effects, even after treatment. Notably, Ms. Smith was readmitted to the hospital in February and March 2012 for worsening shortness of breath. Dr. Rohatgi further testified, similarly to Dr. Nekoranik, that when Ms. Smith had her January 2012 heart attack, she went into congestive heart failure, which caused her lungs to fill with fluid. This congestive heart failure – which Dr. Rohatgi, Ms. Smith's longtime cardiologist, testified was not a preexisting condition – caused her heart to not be able to pump enough blood out of the heart, causing the blood to back up in the lungs. Because of her preexisting idiopathic pulmonary fibrosis, which had already damaged her lungs, the effects of congestive heart failure – her lungs filling with fluid – were augmented in Ms. Smith, and caused her difficulty in getting enough oxygen. Dr. Rohatgi testified that pulmonary fibrosis alone would not result in congestive heart failure.

PCRA Court Opinion, 8/26/2020, at 3-9 (record citations omitted; italics in original).

In summary, according to the Commonwealth's evidence, the victim suffered from a very complicated set of ailments that preexisted the robbery-induced heart attack. Those conditions, however, did not portend her imminent death. Rather, the preexisting conditions, exacerbated by the heart attack and subsequent congestive heart failure, resulted in the victim's death weeks after the robbery.

Next, we quote at length from the PCRA court's summary and analysis of the expert testimony Appellant wishes to produce at a new trial:

> In support of her petition for collateral relief, [Appellant] has asked this court to consider the testimony of three other medical experts – Dr. Arnold Meshkov, Dr. Edward Viner, and Dr. Wisam Abouzgheib. Drs. Meshkov and Viner testified on behalf of [Appellant's] codefendants in two proceedings to which [Appellant] was not a party. Those proceedings were the PCRA hearing of Rogel Suero on May 9, 2017 and the trial of Quadir Taylor on January 12, 2017. By agreement of [Appellant] on October 20, 2017, this Court took judicial notice of the testimony given by Drs. Meshkov and Viner in those other proceedings. While that testimony was, as requested, considered by us in ruling upon [Appellant's] petition in June 2018, due to an oversight those transcripts were not formally made a part of the record herein until August 11, 2020. Dr. Abouzgheib testified on behalf of [Appellant] alone, at a hearing on May 11, 2018.
>
> In his testimony at Mr. Suero's PCRA hearing, which [Appellant] herein has asked us to consider, Dr. Arnold Meshkov testified to his opinion regarding the cause of Ms. Smith's death. Dr. Meshkov is a board-certified cardiologist. He did not examine Ms. Smith, but after review of her medical records and the reports of the forensic pathologists, Dr. Meshkov opined that Ms. Smith's cause of death was clearly her progressive pulmonary fibrosis, and that the heart attack she suffered in January 2012 was not a factor

in her death at all. While Dr. Meshkov acknowledged that Ms. Smith suffered a heart attack in January 2012, he categorized it as very mild. He noted her history of heart problems including atrial fibrillation, coronary artery disease, as well as some enlargement of the heart dating from 2006. Dr. Meshkov also noted Ms. Smith's idiopathic pulmonary fibrosis diagnosis in 2011, less than one year before the robbery, though he stated that she likely had the condition as early as 2010. He then testified that, on autopsy, the lungs of a person who has died of pulmonary fibrosis will be stiff and hard, with extensive scar tissue formation throughout. With respect to Ms. Smith's heart health, Dr. Meshkov notes no significant change in the pumping function of heart or in her coronary artery disease after her heart attack. With respect to Ms. Smith's lung health, Dr. Meshkov noted that her lung function had decreased from 2010 to 2011, that her chest x-ray in late January 2012 showed a progression of pulmonary fibrosis, and that this disease has an unpredictable rate of progression. Dr. Meshkov also testified that pulmonary fibrosis and congestive heart failure are often confused when interpreting x-ray images because they have similar appearance on the x-ray images. Interestingly, he also testified that her chest x-ray in March 2012 showed that her pulmonary fibrosis on that occasion was about the same as it had been in late January 2012. On cross-examination, Dr. Meshkov conceded that it was not unreasonable for Dr. Chmara to conclude that the weight of Ms. Smith's lungs on autopsy was indicative of congestive heart failure. Nevertheless, Dr. Meshkov was firm in his conclusion that Ms. Smith's death was entirely the result of her pulmonary fibrosis, unrelated in any way to her heart attack. In reaching this conclusion, Dr. Meshkov appears to ignore the presence of fluid in Ms. Smith's lungs on autopsy, the lack of change in her chest x-rays from January to March, 2012, and the rapid deterioration of her health condition after the robbery, and discounts the statement of her treating pulmonologist, Dr. Nekoranik, who testified that he would not expect to see such a rapid decline in a patient with only pulmonary fibrosis. Dr. Meshkov, for his part, testified that he had seen patients with pulmonary fibrosis deteriorate rapidly. Finally, Dr. Meshkov testified that he would have been available to testify to these opinions at Mr. Suero's trial in 2013 if called to do so. Since Mr. Suero and [Appellant] were tried together in October 2013, we can impute his availability to testify in [Appellant's] case. Dr. Meshkov gave testimony at Mr. Taylor's trial that was consistent with that given by him at Mr. Suero's hearing.

- 12 -

In addition to the testimony of Dr. Meshkov, […] [Appellant] herein has asked us to consider [] the testimony of Dr. Edward Viner, who is an internist, hematologist, and oncologist. Dr. Viner's work as an internist includes conditions of the heart and lungs, and he is experienced in consulting on challenging diagnoses. As did Dr. Meshkov, Dr. Viner reviewed Ms. Smith's medical records in preparation for his testimony, and noted that she had a variety of preexisting conditions prior to January of 2012, including coronary artery disease, hypertension, high cholesterol, atrial fibrillation, aortic aneurism, and pulmonary fibrosis. While he acknowledged that Ms. Smith suffered a heart attack in January 2012, he categorized it as a low-level heart attack, and said that it was in no way correlated with her death. Dr. Viner disagreed with the idea that small heart attacks can weaken an already weak heart. Dr. Viner testified that when Ms. Smith was admitted to the hospital in March 2012, she was on a high level of supplemental oxygen, that her fibrosis was worsening, and that her pulmonary function was quite low. Furthermore, he testified that Ms. Smith was not in obvious heart failure at that time, and that there was no evidence of decreased heart function after January 15, 2012. While Dr. Viner stated that shortness of breath could come from either a pulmonary or cardiac condition, he felt that it was very clear that Ms. Smith's shortness of breath was the result of her pulmonary condition, which he contended deteriorated quickly, and that the opacities observed on her chest x-rays were fibrotic scarring, and not fluid. As to the fluid found in Ms. Smith's lungs on autopsy, Dr. Viner contended that her lungs likely flooded in the moments just prior to death. While criticizing the forensic pathologist's opinions insofar as he contended that a clinician would know a patient's cause of death best, he could not reconcile the fact that Ms. Smith's treating cardiologist, Dr. Rohatgi, did not share his opinion on Ms. Smith's cause of death. Finally, Dr. Viner also testified that he would have been available to testify to these opinions at Mr. Suero's trial in 2013 if called to do so, which we again impute to [Appellant's] case because they were tried together on that occasion. Dr. Viner gave testimony at the trial of Mr. Taylor that was consistent with that given by him at Mr. Suero's hearing.

Finally, we turn to the testimony of Dr. Wissam Abouzgheib, which [Appellant] herself offered at her PCRA hearing on May 11, 2018. Dr. Abouzgheib is a pulmonary critical care specialist at Cooper University Hospital, and a colleague of Dr. Viner. As did each of the clinicians who testified previously, Dr. Abouzgheib

testified that Ms. Smith was diagnosed with idiopathic pulmonary fibrosis in May 2011. He testified that this condition causes the alveoli framework of the lungs to become thickened, occupying what should be the air space in healthy lungs, thereby preventing the lungs from properly oxygenating the blood stream. He noted that the median survival rate for patients with this condition is three to five years from the time of diagnosis.

Dr. Abouzgheib testified that, at the time of Ms. Smith's pulmonary fibrosis diagnosis, her leg function was at 62 percent and her heart function was normal. He characterized her heart attack in January 2012 as minor, but agreed that tests measuring a substance known as BNP performed at that time indicated some level of congestive heart failure, which he believed began following the robbery. Incongruously, he testified that a BNP test performed in March 2012 ruled out congestive heart failure. He noted that Ms. Smith's lung function decreased in the time between January and March 2012. While acknowledging that Ms. Smith's quality of life decreased significantly following the robbery and her heart attack, Dr. Abouzgheib opined that Ms. Smith's cause of death was acute exacerbation of her pulmonary fibrosis, which he said could not have been occasioned by her heart attack. He accounted for the weight of her lungs on autopsy as being caused by thickening and scarring caused by pulmonary fibrosis. As did Drs. Meshkov and Viner, Dr. Abouzgheib testified that pulmonary fibrosis can be misleading on x-ray and appear to be fluid in the lungs. Finally, we note that Dr. Abouzgheib testified that he would have been available and agreeable to testify in 2013 at [Appellant's] trial if he had been called to do so.

PCRA Court Opinion, 8/26/2020, at 9-14 (record citations omitted).

As noted above, the *en banc* panel of this Court instructed the trial court to assess the credibility of Appellant's proposed experts without relying upon the Taylor jury's apparent rejection of the testimony of Drs. Meshkov and Viner as a basis for finding no prejudice here. The *en banc* panel wrote:

Critically, the **Strickland** Court explained how courts are to assess the prejudicial impact of prior counsel's unreasonable acts or omissions. First, the reviewing court must shift its scope of review to the perspective of the decision maker from the original

prosecution. It must then look for prejudice in light of the law that controlled the prior proceeding. In **Strickland**, the High Court stated how reviewing courts and litigants should frame the prejudice issue as, "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." **Strickland**, 466 U.S. at 695[.]

Next, the reviewing court "must consider the totality of the evidence before the judge or jury" of the original proceeding, **id.** at 695, […] and ask what effect, if any, defense counsel's errors had upon the evidence that **the prior** judge or jury reviewed. Some errors may have had no impact whatsoever on certain facts. Others "will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." **Id.** at 695–96[.]

The strength of the prosecution's case from the original proceeding is a vital part of the reviewing court's inquiry. A "verdict or conclusion only weakly supported by the record is more likely to have been affected by [defense counsel's] errors than one with overwhelming record support." **Id.** at 696[.] Moreover, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." **Id.** "[T]he court should be concerned with whether ... the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." **Id.**

Here, however, the PCRA court did not make the correct factual findings regarding the relation between the expert testimony on causation that Johnson presented at the PCRA proceeding and **her** original prosecution. In assessing prejudice, the PCRA court "reviewed the record of the trial in this case, as well as the expert testimony offered by the defense in Quadir Taylor's trial, the cross-examination of witnesses by Taylor's counsel, and finally the testimony offered by Dr. Abouzgheib ...." PCRA Court Opinion, 6/8/18, at 5. It then held that, because **Taylor's** jury rejected expert testimony that Ms. Smith died of lung disease (as opposed to the robbery-induced heart attack), there was a reasonable probability that the proposed testimony of the three experts would not have changed the outcome of [Appellant's] trial. This was analytical error under **Strickland**/**Pierce**. Whatever Taylor's jury may have thought of

Dr. Abouzgheib's testimony is irrelevant to how [Appellant's] jury might have viewed it **along with** the testimony of Drs. Meshkov and Viner, relative to the prosecutorial evidence presented in [Appellant's] case.

The PCRA court should have made its own credibility determinations on Dr. Abouzgheib's testimony and the testimony of the other two physicians who, but for the failure of [Appellant's] trial counsel to call them, would have testified before [Appellant's] jury. Then, the court should have found what facts, if any, it believed from Drs. Meshkov, Viner, and Abouzgheib's testimony. Next, the PCRA court needed to reweigh the Commonwealth's evidence of guilt from [Appellant's] trial (not Taylor's) in light of the erroneously omitted, expert testimony on Ms. Smith's cause of death and decide what impact, if any, the absence of the three doctors' testimony had upon the evidentiary picture the Commonwealth developed in [Appellant's] trial.

In derogation of **Strickland/Pierce**, the PCRA court compared Dr. Abouzgheib's testimony with the testimony of the defense experts who testified at Taylor's trial. And then, as [Appellant] observes […], the PCRA court took judicial notice of the verdict from Taylor's case, a verdict that is legally irrelevant here. The court therefore did not decide whether the evidence of causation that the Commonwealth presented at [Appellant's] trial was relatively weak in comparison to the testimony of the three physicians [Appellant's] counsel should have called. Instead, the PCRA court performed a cumulative-evidence inquiry, similar to Pennsylvania Rule of Evidence 304 [sic],[2] and found "[w]hile some additional details regarding the process by which physicians diagnose pulmonary fibrosis was offered by Dr. Abouzgheib at [Appellant's] post-conviction hearing, the core of his testimony regarding the cause of [Ms.] Smith's death echoed that offered by Drs. Arnold Meshkov and Edward Viner during the Taylor trial." PCRA Court Opinion, 6/8/18, at 6 (citations omitted).

This inquiry was beside the point, because **no** jury heard Drs. Meshkov, Viner, and Abouzgheib testify against the Commonwealth's experts from [Appellant's] trial. Thus, even if Dr. Abouzgheib's testimony was repetitive of the other two physicians, this does not prove that the verdict in [Appellant's]

---

[2] Rule 403 of the Pennsylvania Rules of Evidence governs the exclusion of relevant but cumulative evidence.

trial would have probably remained guilty. It only proves that the verdict in Taylor's trial would have probably remained guilty. Hence, the PCRA court's factual findings that it made during its prejudicial-impact review miss the mark. The PCRA court therefore made factual findings that were irrelevant to this case. We must remand for the PCRA court to evaluate the factual record under the correct framework of **Strickland**, so that it may apply prejudicial-impact test in the first instance.

The Supreme Court of the United States recently explained appellate review of the **Strickland** prejudice prong in **Andrus v. Texas**, ––– U.S. ––––, 140 S.Ct. 1875, 207 L.Ed.2d 335 (2020), in relation to the role of the fact-finding court. In assessing whether a petitioner for post-conviction relief has proven a reasonable probability of prejudice – *i.e.*, that "the jury [at the petitioner's trial] would have made a different judgment ... the reviewing court must consider the totality of the available [exculpating] evidence – both available at [the petitioner's] trial, and the evidence adduced in the *habeas* proceeding – and reweigh it against the evidence" of guilt. **Id.**, ––– U.S. at ––––, 140 S.Ct. at 1886 (some punctuation omitted).

**Johnson**, 236 A.3d at 69–70 (emphasis in original).

In accord with the remand instructions, the PCRA court made a series of credibility findings. The court found that the Commonwealth's experts gave a credible account of the circumstances of the victim's demise. While the victim suffered from several serious ailments of the heart and lungs, none of those conditions accounted for the congestive heart failure that began after the robbery attack. The heart attack and the subsequent congestive heart failure, according to the Commonwealth's experts, accounted for the hastening of the victim's decline and her death shortly after the robbery. The heart attack and congestive heart failure also accounted for the autopsy findings, including the weight of the victim's lungs and the fluid in her lungs.

The PCRA court concluded that the testimony of the Commonwealth's experts, considered together, provided a credible explanation for the victim's demise that took account of all the available evidence. PCRA Court Opinion, 8/26/2020, at 14-16. The PCRA court also noted that the victim's adult granddaughter testified to a sudden change in the victim's behavior after the robbery. She was noticeably weaker and less active, and she suffered consistently from shortness of breath. The shortness of breath was not apparent prior to the robbery. *Id.* at 16.

The PCRA court criticized all three of Appellant's proposed experts for simply dismissing the idea that the victim's heart attack played any role in hastening her demise. *Id.* at 17-18. The PCRA court criticized Dr. Viner for dismissing the idea that a mild heart attack could have damaged the victim's already weak heart, noting that other evidence of record establishes that "[a] heart attack, by definition, results in the death of cells in the heart." *Id.* at 17. Dr. Abouzgheib, for his part, dismissed the significance of the victim's heart attack even though he acknowledged that she developed congestive heart failure afterward. *Id.* Similarly, regarding Dr. Meshkov, who explained during his testimony that "correlation does not equal causation," the PCRA court noted his disregard of the forensic pathologist's findings as to the cause of the victim's death—particularly the fluid in her lungs as an indicator of congestive heart failure. *Id.* at 17-18.

In summary, the PCRA court found all three of Appellant's experts lacking in credibility because their dismissal of the heart attack as the beginning of the victim's sudden and speedy decline did not adequately account for all the available evidence. In weighing the evidence, in accord with the applicable law and the remand instructions from our *en banc* panel, the PCRA court concluded that the Commonwealth's witnesses provided a thorough and accurate assessment of the victim's demise that accounted for all the available evidence. The Court concluded Appellant failed to establish a reasonable probability that, but for counsel's failure to procure defense experts, the outcome of her trial would have been different.

Appellant claims the testimony of her experts thoroughly accounts for all the medical evidence and provides a valid basis for concluding that the heart attack was unrelated to the victim's decline and demise. Instead, Appellant claims the victim died from acute exacerbation of idiopathic pulmonary fibrosis ("AE-IPF"). Appellant's Brief at 34-41. In supporting her argument, Appellant relies on Dr. Abouzgheib's testimony that the victim's congestive heart failure resolved before death. Appellant's Brief at 40-41. Appellant appears to dispute whether fluid was present in the victim's lungs at her death. Appellant's Brief at 35 n.23 (noting testimony that chest x-rays depicting scar tissue on lungs can be mistaken for fluid in the lungs, leading to an incorrect diagnosis of congestive heart failure). We note that Dr. Chmara's account of the fluid in the victim's lungs was based on his autopsy,

not on an x-ray. Contrary to Appellant's assertions throughout her brief, we find record support for the trial court's findings.

Appellant also argues that the PCRA court erred by not considering the cumulative effect of counsel's errors. This argument misses the mark. Regardless of how many errors Appellant believes her trial counsel made, they all lead to the sole question before us, which is whether the absence of defense causation expert witnesses was prejudicial to her defense.

In our view, the facts of record—including the fluid in the victim's lungs found during the autopsy as indicative of congestive heart failure and the victim's long-time cardiologist's testimony that she began to suffer from congestive heart failure after the robbery-induced heart attack—support the trial court's credibility findings and its weighing of the evidence. Further, we note that the expert evidence was not the only evidence of the victim's sudden change in condition after the robbery. The victim's adult granddaughter described the victim's struggle with shortness of breath and a decline in her day-to-day activities, both of which began suddenly after the robbery. This bolstered Dr. Chmara's testimony about the decline in the victim's quality of life immediately following the robbery. We are cognizant that Dr. Viner attributed the shortness of breath to one of the victim's pulmonary ailments, but as the PCRA court noted, Dr. Viner did not account for the fact that the onset of the victim's persistent shortness of breath coincided with the heart attack.

Further, we observe that the evidence does not support a conclusion that the victim's pulmonary fibrosis would have been fatal in early 2012. The victim was diagnosed in 2011. Dr. Meshkov testified that she may have developed it in 2010. One expert testified that the life expectancy from diagnosis was three to five years, and another from five to ten years. Even if we assume she developed the disease in 2010, the expert testimony does not support a conclusion that the condition would have become fatal in early 2012.

Finally, we must consider the alleged prejudice in light of all the evidence against Appellant. *See Commonwealth v. Treiber*, 121 A.3d 435, 453 (Pa. 2015) (concluding that defense counsel's failure to challenge DNA evidence was not prejudicial given the overwhelming circumstantial evidence of the defendant's guilt). We recognize that the cause of the victim's death, and therefore the sole basis for the murder charge and conviction, was entirely dependent upon expert testimony. *Treiber* is distinct from the instant matter in this respect. Even so, we note the following facts established at trial. First, Appellant and several accomplices attacked and robbed a sickly, elderly victim by putting a pillow over her face and a gun to her head. Second, the robbery induced a heart attack in the victim. Finally, the heart attack coincided exactly with a precipitous decline in the victim's health that quickly culminated in her death. We believe it is fair to say, under these circumstances, that the defense would have been fighting a steep uphill battle to persuade a jury that the robbery-induced heart attack followed by the victim's quick decline and death

was mere coincidence. While we agree with the PCRA court that counsel had no valid basis for failing to investigate and challenge the Commonwealth's causation evidence, we cannot conclude that there was a reasonable probability of a different outcome had counsel done so.

Based on all the foregoing, we conclude the record supports the PCRA court's findings of fact, and we discern no error in its legal conclusions. We therefore affirm the order on appeal.

Order affirmed.

This decision was reached prior to the retirement of Judge Musmanno.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/25/2022